1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    SOUTHERN DISTRICT OF CALIFORNIA
10
11   UNITED STATES OF AMERICA,              Case No.:  3:24-cr-02616-JAH-1
12                    Plaintiff,
                                            **ORDER ON DEFENDANT'S
13   v.                                     MOTION TO SUPPRESS**
14   JUAN BELTRAN,
                                            **[ECF No. 29]**
15                    Defendant.
16
17        Pending before the Court is Defendant Juan Beltran's ("Defendant" or "Beltran")
18   motion to suppress evidence seized from his cross-body bag (hereafter "the cross-body
19   bag" or "the bag") by San Diego County Sheriff deputies and the statements he made to
20   deputies.  ECF No. 29.  Defendant filed his motion to suppress on March 10, 2025 (ECF
21   No. 29), the Government filed its response in opposition on March 26, 2025 (ECF No. 35),
22   and Defendant filed his reply on June 11, 2025 (ECF No. 44).   The Court held an
23   evidentiary hearing on June 23, 2025 (ECF No. 46), where witnesses were called, and
24   exhibits were marked and received.  ECF Nos. 47, 48.[1]  Based upon the above, the Court
25   makes the following findings of fact and conclusions of law.
26   _____
27
28   [1] The Court has also reviewed and considered as evidence in this case an audio recording
     of the 911 call referred to the San Diego Sheriff's Department ("the Sheriff's Department")

# FACTUAL FINDINGS

On October 17, 2024, the Sheriff's Department received a 911 call from a caller (hereafter, "the caller" or "the 911-caller") expressing concerns of a possible domestic violence situation unfolding near a park in San Marcos, a community in San Diego County. This call was recorded and entered into evidence by Defendant. ECF No. 31 at 2 (Exhibit B). The caller told the 911 operator that the situation was "not really an emergency" but that she observed a woman pushing and shoving a man who was following her and telling the man to get away from her. *Id.* at 00:01-00:15. The caller was walking behind the two individuals at San Marcos Boulevard and Tiger Street when she heard the woman yelling at the man "get away from me." *Id.* The caller indicated that the two individuals were walking towards Connors Park and provided a description of the woman and the man. *Id.* at 00:21-00:42. When asked, the caller did not consider the situation an emergency that required paramedics to arrive at the scene and did not indicate that any violence had occurred. *Id.* at 00:50-01:06. According to the caller, however, the interaction between the couple "did not feel safe for the woman." *Id.* at 01:00-01:05. The caller provided the Connors Park address at 320 W. San Marcos Boulevard as the location to which the two were walking. *Id.* at 01:56-02:05. After being asked if the man had a firearm, the caller said she couldn't see one but knew that the man had a sling bag. *Id.* at 02:24-31. The caller indicated that the man wore a white shirt and a blue cap. *Id.* at 02:39-52. When asked again about the bag, the caller described it as a black cross-body bag, which he wore over his shoulder. *Id.* at 03:39-55. The caller indicated that the woman had red hair. *Id.* at 04:09-15. The caller also provided her full name. The dispatcher then advised sheriff

---

relating to potential criminal activity observed by the caller, *see* Defense Exhibit B in ECF No. 31 at 2, the declarations of Deputies Eric Heimer and Thomas Cook as submitted by the Government, *see* ECF No. 35-1 at 1-4 *and* ECF No. 35-2 at 1-4, and the body-worn camera ("BWC") footage of Deputies Heimer, Rost, Cook, and Green. *See* Exhibits A, D, E, and F, respectively, in ECF No. 31 at 2.

deputies by radio transmission of the information provided by the caller, including the description of the female and the male carrying the bag.

Deputy Heimer (or "Heimer") was the first deputy who arrived at Connors Park. He testified that, as the first deputy on the scene, he was considered the lead deputy. Evidentiary Hearing Transcript (hereafter "Hr. Tr.") at 33:14-15. ECF No. 46. Heimer testified that while driving through the parking lot of Connors Park, he observed a male, later identified as Defendant Juan Beltran, standing over a female, later identified as Cruz Esperanza Ponce (or "Ponce"), who was sitting at a concrete park bench. Hr. Tr. 5:22-25, 6:1-8. The deputy testified he saw Beltran's arms and hands raised over her in an aggressive manner, appearing to be agitated and irate. *Id.* at 6:11-16. Deputy Heimer's reference point was from a distance of approximately 200 feet. *Id.* at 22:23-25, 23:1. Heimer had a narrow window of time and space to observe Beltran as he was driving through the parking lot. *Id.*

Upon spotting Beltran a second time walking in his direction on a sidewalk, Heimer parked, exited his marked vehicle, turned his BWC microphone to "on," and approached Beltran, who was carrying a cross-body bag over his shoulder. BWC '904 at 18:22:58-23:00 (ECF No. 31 at 2, Ex. A).[2] Beltran matched the description of the "aggressor" Heimer had observed seconds earlier standing over Ponce at the park table and also generally matched the 911-caller's description. Heimer testified that he believed that Beltran, in light of his body language, gait, and demeanor, appeared to still be irate from his encounter with Ponce at the park bench. Heimer also testified that from his experience, domestic-related radio calls for assistance can and do get out of control in a short amount of time. Hr. Tr. at 6:24-25, 7:1-5. Heimer's BWC also depicts Beltran approaching him, holding a bottle of water in one hand and a small, orange-colored object in the other. Heimer twice directed Beltran to "come here," stating: "I need to talk to you. Don't be

_____

[2] The time-stamped BWC citations herein relate to the time stamps captured by Heimer's BWC and recorded in the upper right corner of the camera footage, unless otherwise noted.

fronting me," and "put your stuff down, put your hands behind your back.  BWC '904 at 18:23:00-13.

During this initial encounter with Beltran, Heimer's BWC depicted Ponce (with red hair) in the background, quickly walking towards their location from a distance of approximately 35-40 yards away from the table where Heimer first observed the couple's location.  Beltran asked Heimer, "Am I under arrest?".  BWC '904 at 18:23:13.  Heimer responded by saying, "You are being detained right now because we need to figure out what DV [domestic violence] just happened, put your hands behind your back."  *Id.* at 18:23:13-17.  As Heimer approached Beltran to handcuff him, Heimer observed, and his BWC captured, Beltran moving his body bag towards the front of his body.  Heimer removed the bag off of Beltran's person and placed it on the concrete table next to them. *Id.* at 18:23:22-27.

Deputy Rost (or "Rost"), arrived on the scene seconds behind Deputy Heimer and made contact with Heimer and Beltran at the beginning of the encounter, per the time on her BWC (BWC X81724680) (hereafter "BWC '680"), ECF No. 31 at 2, Ex. D at 18:23:05,[3] and assisted Heimer with handcuffing Beltran, along with Deputy Green (or "Green") who arrived on the scene seconds behind Rost.  During the handcuffing, Ponce can be seen walking towards and standing very close to the deputies and Beltran.  *Id.* at 18:23:24-44.   Ponce asked, "what's happening…he's [Beltran] not doing anything," and then told Beltran "to relax."  *Id.* at 18:23:40-44.  At one point, Ponce is observed on Rost's BWC extending her arm towards Beltran's shoulder and can be heard telling him again to relax and calm down while the deputies were making efforts to handcuff him.  *Id.* at 18:23:55-24:00.  Rost's BWC depicts the cross-body bag on the table at BWC '680, 18:23:28-18:24:06.

---

[3] The Court notes that the timers on the BWCs of the various deputies do not appear to be synchronized with one another.

Deputy Cook (or "Cook") arrived on the scene while Beltran was being handcuffed, but did not physically engage in efforts to handcuff Beltran.  During handcuffing, three pocketknives clipped to Beltran's waistband can be seen on Deputy Rost's BWC, BWC '680 at 18:23:30-18:24:31, which were thereafter removed by Deputy Heimer.  BWC '904 at 18:24:32-18:24:44.  Heimer Decl. at ¶ 5.  Deputy Cook observed Heimer removing the pocketknives.  Hr. Tr. 45:3-6.  After removing the pocketknives, Heimer conducted a pat down which did not produce additional weapons.

While deputies were completing the handcuffing, which took approximately a minute, BWC '904 at 18:23:25-18:24:31, Ponce removed the bag from the table and placed it over her shoulder.  *See* BWC '680 at 18:24:24, 27-31, *and see* Green's BWC, BWC X81643441 (hereafter "BWC '441"), ECF No. 31 at 2, Ex. F at 18:24:05-22.  As Ponce walked away, she was followed by Deputy Rost who then led and directed Ponce to a park bench a distance away from Beltran.  BWC '680 at 18:24:30-34.  Rost stated "come here, let me talk to you real quick," as they walked to the bench.  BWC '680 at 18:24:30-34.  Upon arriving at the bench, Ponce sat and remained there for the balance of the encounter.  Ponce is depicted on video as wearing baggy shirt and pants.  *Id.* at 18:24:36-57, 18:30:51.

With Beltran subdued by handcuffs and his arms behind his back, Heimer directed Beltran to move to another bench located further away from Ponce's location.  BWC '904 at 18:24:53-18:25:00.  This bench, according to Deputy Cook's testimony, was located approximately 10 to 15 yards away from the bench where Ponce was directed by Rost.  Hr. Tr. 50:23-25.  *See also* Court Order Ex. 1 (depicting screenshot of BWC footage reflecting the distance between the park benches where Beltran and Ponce sat).  Deputy Cook then asked Beltran, "What's up with all the knives?", to which Beltran responded: "I'm from Escondido and I live here in San Marcos, bro."  (BWC X81639766) (hereafter "BWC '766"), ECF No. 31 at 2, Ex. E at 18:24:40-18:24:47.  Heimer advised Beltran of the reason for the stop, indicating a passerby reported a domestic violence incident between him and Ponce.  BWC '904 at 18:25:00-28.  Heimer asked Beltran if there was any physical violence between him and Ponce or unwanted touching, to which Beltran stated that

nothing physical had happened between the two. *Id*. at 18:25:15-25. Heimer then asked about the nature of the argument, and Beltran disputed that he and Ponce had been arguing. *Id.* at 18:25:25-30.[4]

Heimer then asked Beltran for his name and whether he was on probation or parole. BWC '904 at 18:25:34-38. Heimer asked Beltran how long it had been since he was "on paper," and Beltran responded that he got off in July. Beltran asked: "How long will this take?". *Id.* at 18:26:03-05. Heimer responded; "the faster you work with us…the faster…the better." *Id*. at 18:26:09-12. Beltran stated that he had a job interview to attend. Heimer returned to asking for additional identification information from Beltran including his date of birth, and asked Beltran if he was "Fourthed [sic] up." Beltran responded that he was not on a Fourth Amendment waiver, and that he knew his rights. Heimer responded, "But you also came up on me and there's no need for that." *Id*. at 18:26:50. Beltran responded, "Didn't you call me over?". Heimer said, "Yeah." Beltran then asked, "What did you want me to do, run the other way or something…come on." *Id*. at 18:26:57-59. Heimer's response is inaudible but appears to be dismissive. *Id*.

After searching the police database on his cellphone based on Defendant's biographical information–and after finding Defendant's record and accompanying photograph in his system, BWC '904 at 18:27:11-14–Heimer proceeded to ask Beltran a series of questions: first, if he was "still with Diablos." *Id*. at 18:27:39. Beltran responded that he was inactive. Heimer then asked Beltran, "What was your moniker…what did they call you?". *Id*. at 18:27:38-40. Beltran's response is inaudible. Heimer then made a brief call to dispatch. Thereafter, he told Beltran: "If your story is that nothing physical happened, that it was verbal only…then, I'll leave it at that, dude." *Id*. at 18:27:39-18:27:55. Beltran responded that his story was that "it wasn't even verbal." *Id*. at 18:27:55-56. Heimer then left Beltran with Deputy Cook and proceeded to speak on his

---

[4] The amount of time that Deputy Heimer spent investigating the domestic violence incident was approximately thirty seconds. BWC '904 at 18:25:00-18:25:30.

device, indicating that Beltran had a prior offense.  *Id.* at 18:27:58.  Heimer can be seen standing nearby Beltran and Cook as he continued to review information displayed on his cellphone.

Concurrently with the above events, Deputy Rost explained the reasons for the stop to Ponce at the table where she sat, an estimated 10 to 15 yards away from Beltran, including the 911 caller's observations and the deputies' need to investigate the incident, and Rost asked Ponce questions relating to what happened.  BWC '680 at 18:24:42-18:27:48.  Ponce told her that she and Beltran were not arguing, that no domestic violence or shoving between them had occurred, and that it was unfair that deputies had immediately placed Beltran in handcuffs.  *Id.*  Ponce asked if the reason deputies treated Beltran so harshly was because of how he looked.  Deputy Rost, and Deputy Green who arrived at Ponce's location during this conversation, explained to Ponce why the handcuffing of Beltran was necessary because Beltran had been identified as the aggressor, with Ponce responding by saying again that no domestic violence had occurred.  *Id.* at 18:25:55-26:14, *and see* BWC '441 at 18:26:30-27:15.  Ponce clearly articulated multiple times, starting with her conversation with Deputy Rost moments after Beltran was placed into handcuffs, that no violent incident had occurred between her and Beltran.  BWC '680 at 18:24:42-18:27:48.  Ponce also asked if Beltran could be "out of cuffs," BWC '680 at 18:29:11-12, and Rost responded, "Yeah, once we figure out what's going on, we can."  *Id.* at 18:29:13-17.  Deputy Rost remained, and conversed, with Ponce for the entirety of the encounter and up to the point of Beltran's arrest.

Meanwhile, Beltran spoke with Cook about his plans to attend school.  BWC '441 at 18:29:15-20.  Deputy Green left Rost and Ponce, and approached Heimer who was still reviewing his cellphone.  BWC '441 at 18:28:20-25.  Green and Heimer examined and discussed the pocketknives recovered from Beltran's waistband.  *Id.* at 18:28:35-50.  Heimer stated, "None of them work."  *Id.*  Green then stated to Heimer, "it's considered nothing?" and Heimer responded, "No, and it wasn't open anyway."  *Id.*  Green then changed the subject to the reported domestic violence incident: "It sounds like whoever

called, just a misunderstanding." *Id.* at 18:28:50-29:01.  Heimer responded, "Same thing with her, verbal only?" to which Green responded immediately, "Yeah.  Just whoever called…just a misunderstanding." *Id.* at 18:28:55-18:29:03.  *See also* '904 at 18:28:55-29:05.

While Green spoke with Heimer about the pocketknives and the "misunderstanding," Cook can be heard speaking with Beltran in a calm manner,  BWC '441 at 18:29:07-20, asking Beltran if he had any interaction with police before.  After learning from Beltran that he had been "on paper," Cook asked Beltran for what he was "on paper."  BWC '766 at 18:28:15-29:00.  Beltran responded that he was on paper for drugs.  *Id.* at 18:28:54-56.  Deputy Cook asked Beltran if he was clean now, which Beltran confirmed.[5]  Deputy Cook then asked Beltran about the educational degree he was pursuing, and Beltran responded by identifying the program and his intention to switch into social work.  *Id.* at 18:29:10-14.  He and Beltran appear to be calmly speaking with one another about Beltran's plans for work and school, with Cook being depicted on video as smiling after hearing about Beltran's degree program and future plans.  *Id.*  Beltran subsequently asked if he could get out of the handcuffs, and Deputy Heimer responded: "Not yet.  I'm still waiting."  BWC '904 at 18:31:29-35.  Beltran asked for what Heimer was waiting.  Heimer responded, not by referencing the status of the domestic violence investigation, but by stating:  "To see if you're still valid on paper." *Id.*  Deputy Green can be heard stating that it would be ideal to have Beltran out of handcuffs, but that they needed to secure the situation in order to investigate the call they had received.  BWC '441 at 18:30:24-32.  Thereafter, at no point does Heimer or any other deputy ask Beltran <u>any</u> additional questions relating to investigating the reasons for the stop.

At the table approximately 10 to 15 yards away, Ponce can be seen wearing a baggy T-shirt and pants, sitting calmly near Rost, *see e.g.* BWC '680 at 18:28:40, yet no deputy

---

[5] Deputy Cook's BWC audio at this moment captures Green and Heimer discussing the 911 call as a "misunderstanding."  BWC '766 at 18:29:02-04.

patted her down despite the nature of her clothing.  The Court finds that, for the majority of the encounter, there existed a continuous conversation and/or interaction between Ponce and/or Rost, Green, and Cook without <u>any</u> verbal or visual evidence captured on video establishing any concern by deputies suggestive of a danger to their safety posed by Ponce, or any indication that they perceived Ponce to be armed or dangerous.  *See e.g.* BWC '680 at 18:24:31-47, *and see generally* BWC '680.

After speaking with Green about the "misunderstanding," and confirming with Green that both Beltran and Ponce had provided statements that the incident for which the deputies were called to investigate was "verbal only,"  BWC '904 at 18:28:45-18:29:05 & BWC '441 18:28:50-29:01, Heimer continued to search his cellphone for information relating to Beltran.  While Beltran and Cook were speaking about Beltran's future plans for work, Heimer's BWC depicted that Heimer looked in the direction of Ponce and the bag over her shoulder.  *See* BWC '904 at 18:29:38.  Heimer's BWC then depicts Heimer looking away from Ponce towards Beltran, and then quickly turning back to look again in Ponce's direction.  *Id.* at 18:29:38-42.

Heimer then asked Beltran:  "Where did your fanny pack go?" BWC '904 at 18:29:42-45.  Beltran said that it was with his girlfriend.  Heimer responded, "Oh, she took it."  *Id.* at 18:29:45-49.  Heimer then asked Beltran if he had anything illegal in the bag, if there was a "strap" in the bag, and whether Heimer had permission to search it.  Beltran responded no to each question.  *Id.* at 18:29:49-18:30:00.  Cook, overhearing this discussion between Heimer and Beltran, began to move towards Ponce's location, BWC '766 at 18:30:00-18, BWC '904 at 18:30:04-18, with Heimer following Cook.  BWC '904 at 18:30:04-18.

While Cook and Heimer were moving toward Ponce, Rost and Green were speaking with Ponce relating to her concerns about the stop and the handcuffing of Beltran.  BWC '680 at 18:29:17-30:11.  Rost asked Ponce questions relating to her identity, such as her name and date of birth, and whether she had any criminal history.  Rost and Ponce discussed the length and nature of Ponce's relationship with Beltran, and her having no

prior convictions, no time on probation, and no other contact with law enforcement. *Id.* As Cook and Heimer arrived at Ponce's location, Rost and Ponce were still speaking with one another, and after listening to their conversation, Cook asked Ponce who owned the bag she had on her back. *Id.* at 18:30:15-20. Ponce stated it was hers. Heimer then asked, "That's his bag, right?". BWC '904 at 18:30:21-29. After Ponce repeated that it was her bag, Heimer left Cook, Ponce, and Rost, and paced about the plaza before returning to Ponce. *Id.* at 18:30:29-50.

While Heimer paced about, Cook placed his foot on the bench where Ponce was sitting and asked her, "did my partner check you for weapons at all?" BWC '680 at 18:30:39-43. Ponce said no. *Id.* at 18:30:43-46. Rost can also be heard affirming that Ponce had not been patted down. BWC '766 at 18:30:44-47. Cook asked Ponce to place the bag on the park table where she was sitting, and Ponce asked Cook, "why do you need to search me though?" *Id.* at 18:30:47-50. Cook responded by saying that he was not searching her but conducting a weapons pat-down. *Id.* at 18:30:50-52. Ponce removed the bag from her back and placed it on the bench's table but held on to the bag's strap in reaction to Beltran yelling: "Hey, what are you doing? No, you're not on Fourth waiver, they can't search you, she's not on Fourth waiver." BWC '441 at 18:30:54-31:10.[6] Ponce stated that Cook did not need to search it. BWC '766. at 18:30:57-31:02. Cook reiterated to Ponce he was not searching it, and Ponce relayed the same to Beltran across the plaza.

---

[6] Immediately before this moment in the encounter, Beltran was conversing with Green, and Beltran asked Green why he was still in handcuffs. BWC '441 at 18:30:20-29. Green stated to Beltran, "Someone else called. She [Ponce] didn't call. You didn't call. At the end of the day, I'm not going to just start—and we didn't see nothing, so I'm not going to like have you unnecessarily sit in handcuffs." *Id.* at 18:30:35-40. After Beltran responded by asking when the handcuffs would be removed, Green responded: "In a second, cause now that we got this lined out, we are going to take you out, and let you walk back over and collect your stuff. Obviously I don't think you're going to do anything, you're obviously turning things around, that's just how we are going to [inaudible]." *Id.* at 18:30:40-59.

3:24-cr-02616-JAH-1

BWC '680 at 18:30:54-31:03.    Ponce then releases the strap and sits down.[7]   At that moment, Cook gained exclusive control of the cross-body bag.

Cook began physically examining the exterior of the bag, and then placed the bag down on the table, within two to three feet of Ponce.    BWC '766 at 18:31:18-29.    Cook abandoned the bag by Ponce and proceeded to walk towards Heimer.    Heimer at this point in the encounter stood near Green and Beltran at Beltran's location.    Beltran asked Heimer, "Okay can I get the cuffs off now?".    BWC '441 at 18:31:26-28.    Heimer responded, "Not yet, I'm still waiting."    Beltran asked, "What are you waiting for," and Heimer responded, "To see if you're still valid on paper."    *Id.* at 18:31:30-33.    Heimer continued, stating, "Dude, if I believed everything that everyone told us, we wouldn't be good at our job."    *Id.* at 18:31:33-38.    Beltran responded, "It doesn't take that long," to which Heimer stated, "It is right now."    *Id.* at 18:31:38-42.    At this moment, Cook gestured to Heimer to speak with him, and Heimer joined Cook.     *Id.* at 18:31:42-47.

Cook and Heimer walked away to a location out of listening range of Green, Rost, Beltran and Ponce, huddled, and muted the audio functions on their BWCs.    *See* '766 at 18:31:51-32:54 (Cook's BWC), *and see* '904 at 18:31:50-32:54 (Heimer's BWC).    The last thing captured by the audio recording, before the audio was disabled by the deputies, is Deputy Cook stating:    "Something is in that bag."    BWC '904 at 18:31:48-52.

After their muted discussion, which lasted almost a minute, *see* BWC '904 at 18:31:52-32:51, both Heimer and Cook walked back to Ponce and the bag left on the table. Before they reached Ponce, Ponce can be heard discussing Beltran's situation with Rost, and his improvement and adjustment since his prior arrest and his completion of probation. BWC '680 at 18:32:24-37.    Heimer began his external examination of the bag, BWC '904 at 18:32:57-33:03, stating that he felt something "bulbous."    BWC '680 at 18:33:10-17.

---

[7] On the BWC footage, Cook and Heimer do not appear to be alarmed for their safety by Ponce temporarily holding on to the strap while Beltran protests Cook's confiscation of the bag.

3:24-cr-02616-JAH-1

Heimer then asked Ponce if there was a methamphetamine pipe in the bag. *Id*. at 18:33:17-33:35.  Ponce indicated that the deputies were not allowed to search her bag.  *Id.* at 18:33:40-49.  Beltran can be heard in the background again saying that neither he nor Ponce were on a Fourth Amendment waiver. *Id.* at 18:33:50-34:10.

Heimer proceeded to open the bag and subsequently pulled out a small glass pipe wrapped in a paper towel (BWC '904 at 18:33:54), then a wallet (*id.* at 18:34:23-25). While showing Ponce the pipe, Heimer told her:  "this is what I found so now the bag, I can search it, because that's illegal." *Id.* at 18:34:11-14.  Heimer proceeded to pull out other items.  On his radio, Heimer is heard saying "code [inaudible]" (18:34:44-46) and removed a firearm from the bag. *Id.* at 18:34:56-18:35:04.  Beltran was arrested and escorted to a patrol car shortly thereafter.  The entire encounter, from its initiation to arrest, lasted approximately 15 minutes.  *See* '766 at 18:23:58-18:38:30.

After Beltran's arrest, Heimer stated, "I didn't check his 'C.I.' obviously but I guarantee he's a convicted felon."  BWC '904 at 18:43:19-24.  The deputies joked about Beltran's multiple statements that he was not on a Fourth Amendment waiver, *id.* at 18:43:07-12, and when one deputy asked if he was on probation at the moment, another responded, "Not right now.  It doesn't matter, he used to be on probation." *Id.* at 18:43:27-39.

Deputy Heimer testified that he had reason to believe the bag contained firearms. Hr. Tr. 39:6-12.  He also testified, as the video footage confirmed, that Beltran was compliant after being handcuffed.  Hr. Tr. 37:23-25, 38:1.

///

1

**DISCUSSION**

2       The parties present argument on three distinct questions, each of which will be

3  reviewed by the Court in turn.  The parties disagree on (1) whether the *Terry* stop of

4  Defendant Beltran escalated to a *de facto* arrest of the defendant, (2) whether the search of

5  Defendant's bag while it was held by Ponce was supported by *Terry*, and (3) whether the

6  Defendant was "in custody" while he made statements to the deputies.  ECF No. 44 at 3.

7  **I.    Whether the *Terry* Stop Escalated to a *De Facto* Arrest.**

8         **A. The Initial Contact**

9        Beltran contends that his placement into handcuffs at the beginning of the asserted

10  *Terry* stop (or encounter) exceeded the scope of a *Terry* stop and made the detention the

11  equivalent of a *de facto* arrest.  ECF No. 29 at 6-7.  Defendant contends that officers were

12  not justified in handcuffing him after responding to a call involving a verbal argument, not

13  a violent attack, between the couple.  *Id*.  Defendant further contends that deputies used

14  aggressive methods to restrict his liberty, including by handcuffing and surrounding him.

15  *Id.*

16        The Government, in response, argues that the deputies' detention of the Defendant

17  complied with the requirements of a *Terry* stop and did not escalate into a *de facto* arrest.

18  ECF No. 35 at 7-8.  The Government contends that caselaw supports an officer's ability to

19  handcuff a suspect during a *Terry* stop without the stop turning into an arrest.  *Id.* at 8.  The

20  Government also argues that officers had a justified belief that the situation could have

21  turned violent if Defendant and Ponce were not separated and if Defendant was not placed

22  into handcuffs, a situation that would support a more restrictive stop under *Terry v. Ohio*.

23  *Id.* at 9 (citation omitted).

24        "There are two categories of police seizures under the Fourth Amendment: *Terry*

25  stops and full-scale arrests."  *Reynaga-Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir.

26  2020).  During a *Terry* stop motivated by reasonable suspicion that criminal activity is

27  afoot, "the officer may ask investigatory questions, but the scope of the detention must be

28  carefully tailored to its underlying justification."  *United States v. In*, 124 F.4th 790, 794

(9th Cir. 2024) (citation omitted). "At some point, an investigative stop can no longer be justified as an investigative stop, and turns into an unconstitutional de facto arrest." *Id.* (citing to *United States v. Sharpe*, 470 U.S. 675, 685 (1985)) (quotations omitted). In order to determine whether a *Terry* stop has turned into a *de facto* arrest, courts consider the totality of the circumstances, "including the severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances." 124 F.4th at 794-95 (citations omitted).

Courts evaluating the severity of the intrusion and aggressiveness of the officer's actions must determine the extent to which the suspect's liberty was restricted. *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014). This determination requires courts to "review the situation from the perspective of the person seized, assessing whether a reasonable innocent person in these circumstances would have felt free to leave after brief questioning." *Id.* The evaluation of the remaining factor, the reasonableness of the officer's methods, requires an evaluation of the justification of the officer's tactics, and "whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* "This inquiry is undertaken from the perspective of law enforcement." *Id.* In sum, courts within the Ninth Circuit "decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (emphasis in the original). While certain police actions could constitute a *de facto* arrest where suspects are "cooperative," "those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists." *Id.* at 1185. Overall, the inquiry centers on reasonableness under the circumstances. *Id.*

Here, officers responded to a 911 call involving a domestic altercation taking place near a public park. The caller identified the two individuals involved with sufficient particularity, including by reference to their clothing, the nature of their interactions, and

the direction they were walking.  The caller stated that the two were involved in a "verbal argument," where the woman had pushed the man away on multiple occasions and repeated "get away from me."  *See* ECF No. 31 at 2, Ex. B at 1:00-1:10.  Deputy Heimer, the first officer arriving at Connors Park, while driving through the parking lot immediately recognized a man and woman as the individuals described by the 911-caller.  Deputy Heimer testified that, while he was driving, he saw the man standing over the woman with his arms raised over her in an animated manner, and the man appeared irate.  Hr. Tr. 6:4-14.

Deputy Heimer approached Beltran, and twice directed him to "come here," and stated, "I need to talk to you. Don't be fronting me," (BWC '904 18:22:04-06), and "put your stuff down, turn around, and put your hands behind your back (*Id.* at 18:22:59-18:23:12).  Heimer's BWC depicts Beltran approaching him.  *Id.*  Heimer also testified that, from his experience, domestic-related radio calls for assistance can and do get out of control in a short amount of time.  Hr. Tr. 6:24-25, 7:1-5.

The Court finds that Heimer had reasonable suspicion to detain Defendant upon his arrival at the scene.  During a *Terry* stop motivated by reasonable suspicion that criminal activity is afoot, "the officer may ask investigatory questions, but the scope of the detention must be carefully tailored to its underlying justification."  *In*, 124 F.4th at 794 (citation omitted).  The 911-caller had observed sufficient interactions between Beltran and Ponce, and provided sufficient identifying characteristics about the two individuals to provide Heimer and the other deputies with reasonable suspicion to stop Beltran and engage in an investigation on the nature and scope of the domestic altercation that was reported.[8]  Heimer also had justification to handcuff the Defendant, given his assessment that

---

[8] The reliability of a report provided by a 911 caller is heightened when the caller provides a detailed description of the events and individuals the caller observed firsthand, the call is made in close temporal proximity to the reported incident, and the caller provides his or her telephone contact information to the 911 operator, as the caller did in this case.  *See Navarette v. California*, 572 U.S. 393, 399-401 (2014).

1  Defendant appeared irate upon his arrival on the scene, and given Heimer's experience that
2  domestic altercations can quickly get out of control.

3      Placing an individual in handcuffs is not, on its own, enough to exceed the limits of
4  a *Terry* stop. *Gallegos*, 308 F.3d at 991-992 (affirming that handcuffing, on its own, does
5  not convert a *Terry* stop into an arrest) (collecting cases).   While placing Defendant in
6  handcuffs is a significant intrusion on his liberty, it was justified at the initiation of the
7  encounter when Heimer arrived on the scene and began a limited investigation into the
8  reported domestic violence incident.    As a result, the Court finds that deputies complied
9  with *Terry* when they placed Defendant into handcuffs when initiating the *Terry* stop.

10      **B. Post-Handcuffing Detention**

11      The same conclusion cannot be found for the remainder of the stop.  Once deputies
12  determined that no criminal activity existed involving a suspected domestic violence
13  incident between Defendant and Ponce, their justification for detaining Defendant expired.
14  "[A] *Terry* stop must be limited." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*,
15  542 U.S. 177, 185 (2004).  "The officer's action must be 'justified at its inception, and
16  reasonably related in scope to the circumstances which justified the interference in the first
17  place.'" *Id.* at 185 (citations omitted).  In other words, "the scope of a search must be
18  '<u>strictly tied to and justified by</u>' the circumstances which rendered its initiation
19  permissible.'" *Chimel v. California*, 395 U.S. 752, 762 (1969) (quoting *Terry v. Ohio*, 392
20  U.S. 1, 19 (1968)) (emphasis added).

21      "Because *Terry* involved an exception to the general rule requiring probable cause,
22  [the Supreme] Court has been careful to maintain its narrow scope." *Dunaway v. New*
23  *York*, 442 U.S. 200, 210 (1979).  When officers stop an individual on the basis of
24  reasonable suspicion of involvement in criminal activity, officers "may ask them to explain
25  suspicious circumstances," including the details of the suspected crime being investigated,
26  "*but any further detention or search must be based on consent or probable cause*," *id.* at
27  212 (citation omitted) (emphasis in the original), or officer safety.  The "scope of the
28  intrusion permitted by the Fourth Amendment" allows an officer to detain an individual

while investigating his or her role in a crime based on the officer's reasonable suspicion, *Gallegos*, 308 F.3d at 991, but the Fourth Amendment does not allow officers to engage in a general investigation of the detainee after the original and valid criminal investigation leads nowhere. *See e.g. Dunaway*, 422 U.S. at 210-211 (collecting cases).

Indeed, the Ninth Circuit has recently found that officers who exceed a limited *Terry* stop in order to advance a general criminal investigation of the suspect violate the suspect's Fourth Amendment rights, requiring suppression of the fruits derived from the subsequent investigation. *United States v. Baker*, 58 F.4th 1109, 1117-1118 (9th Cir. 2023). In *Baker*, the Ninth Circuit held that the defendant had successfully demonstrated "that the handgun was discovered as a result of police conduct that violated his Fourth Amendment rights." *Id.* at 1117-1118. The court found that the Government was "unable to explain how the officers' post-patdown detention and search for the car" located in a nearby parking lot, "was intended to confirm or dispel their suspicions about a crime being committed or to secure the safety of anyone on the scene." *Id.* The court also found that "[h]ad officers limited their *Terry* stop to a brief detention and protective patdown search of Baker, they would have had no occasion to search for a car in an adjoining parking lot that matched the key fob hanging from Baker's belt loop." *Id.* (emphasis added). The continued detention of the suspect must be connected with the original purposes for his stop under *Terry*, which justified the interference and detention of the suspect in the first place. *Hiibel*, 542 U.S. at 185, *and see Terry*, 392 U.S. at 19. Otherwise, the continued detention constitutes a violation of the suspect's Fourth Amendment rights.

Here, Heimer testified that at no point in the encounter did he consider releasing Beltran, even though he had no probable cause to arrest Beltran for the domestic violence call, Hr. Tr. 39:13-16, and that, prior to the bag search, his stated reason for not releasing Beltran was that "I was still in the totality of the circumstances and [was] still investigating the call." *Id.* at 39:17-22. The record supports Heimer's testimony that he did not engage in discussion with any deputy or Beltran, and did not undertake any actions that would indicate his intention to release Beltran and terminate the *Terry* stop, despite the fact that

deputies, including Heimer, had already concluded that (1) the stories of Beltran and Ponce were substantially similar, (2) no physical evidence of the reported violence existed, and (3) no further leads were developed to confirm the 911-caller's suspicion.[9]

Heimer's testimony, however, that he was "still in the totality of the circumstances" and that he was "still investigating the call," Hr. Tr. 39:20-22, has no support in the record. Heimer posed only <u>two</u> questions to Beltran related to the suspected criminal activity that justified the stop, namely the reported domestic violence incident. *See* BWC '904 at 18:25:02-30, *and see id.* at 18:27:39-18:27:58. He failed to ask any additional investigatory questions about the incident designed to facilitate or develop other leads that may confirm or deny the report of the 911 caller. Instead, the record demonstrates that Heimer proceeded to ask Beltran a series of questions, all of which involved Beltran's prior criminal history and Heimer's suspicions of Beltran's criminal gang status, whether active or expired. Heimer knew firsthand, and early on in the stop, that Beltran had an association with a criminal street gang, in light of the results generated by his records checks and his persistent interest as to whether Beltran was "Fourthed up," or on a Fourth Amendment waiver. After Heimer's initial two questions to Beltran, there was no continuing investigation by any deputy of the facts related to the 911 call.[10]

After acknowledging that the 911-caller's report was likely "just a misunderstanding," Heimer continued to detain the Defendant as his full attention shifted to Beltran's prior offenses and potential gang membership. Heimer engaged in tactics to search and seize Defendant's bag in order to advance his interests in a general criminal

---

[9] This Court notes that Deputy Green, being apparently mindful of his training and experience, had reason to believe that the *Terry* investigation should have been considered complete after deputies closed their investigation into the domestic violence incident, and that the encounter should have been subsequently terminated as no facts were determined or developed to confirm the 911 caller's suspicion. *See supra* n.6. Deputy Heimer did not share the same reasonable officer's mindset.

[10] In Deputy Rost's conversation with Ponce, Ponce reiterated her initial statement across the encounter that no violence between Beltran and her had occurred.

liability investigation, without demonstrating exigent circumstances, officer safety, consent, or probable cause.  Heimer did not engage in discussion with <u>any</u> deputy, or undertake any actions otherwise, that would be indicative of his intention to release Beltran and terminate the *Terry* stop.  Deputy Heimer "had no reason to continue the detention after he had asked his initial investigatory questions," and his subsequent investigation exceeded the scope of *Terry*.  *See United States v. Thomas*, 863 F.2d 622, 629 (9th Cir. 1988) (holding that unjustified questions posed by officers cannot be used to extend a detention under *Terry*).  *See also Baker*, 58 F.4th at 1117-1118 (holding that officers exceeded the boundaries of a limited *Terry* stop by engaging in a generalized investigation of the defendant's property, after their investigation pursuant to *Terry* was complete).

The Court finds that the Defendant was lawfully detained pursuant to *Terry* for the first portion of the encounter, but unlawfully detained once Heimer learned that the caller's suspicions were not corroborated by the *Terry* investigation.  Heimer, however, continued to question Defendant regarding his potential gang affiliation, moniker, the presence or absence of a Fourth Amendment waiver in his file, the location of his bag, and whether Defendant would provide consent for deputies to search his bag, and the continued records checks, that were not limited or tailored to the stop's underlying justification.  The *Terry* stop to investigate a domestic altercation morphed into a general detention of the Defendant in excess of the Fourth Amendment's constraints on government conduct, beginning with Heimer's questions about Beltran's gang affiliations and Beltran's subsequent response that he was inactive and that the incident was not physical.  BWC '904 at 18:27:56.  No deputy asked Beltran any further questions about the reported domestic altercation after this time. [11]

---

[11] For all purposes, the deputies' limited investigation into the potential crime for which they were called was completed by BWC '904 at 18:27:56.

1    As such, the continued detention of the Defendant morphed into a general criminal
2    investigation unrelated to the initial intrusion on Beltran's Fourth Amendment rights and
3    cannot be sanctioned by the legitimacy of the *Terry* stop.

### II.    Whether the Search of Defendant's Bag Was Supported by *Terry.*

The parties also disagree on whether deputies had a valid legal basis under *Terry* to
frisk and/or search the bag found on Ponce. If the answer to this threshold question is that
deputies had <u>no</u> reasonable basis under *Terry* to frisk the bag, then the law clearly holds
that all contents found during the bag search must be suppressed as fruits of a Fourth
Amendment violation. *Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963). If,
instead, the answer is that the frisk of the bag was supported by *Terry*, the subsequent issue
would be whether the extensive probing of the bag by Deputy Cook comported with the
limits the Supreme Court has placed on the scope of a lawful *Terry* frisk. The Court begins
with the first issue: did Deputy Cook's frisk of the bag comply with the requirements of
*Terry*, or did it constitute an unreasonable search and seizure under the Fourth
Amendment?

The parties agree that the legal standard under *Terry* is whether deputies have a
reasonable basis to believe that a suspect is "armed and dangerous" to frisk him or her, and
his or her personal items. *See* ECF No. 29 at 9-10 *and* ECF No. 35 at 12-14. The parties
disagree, however, on whether Beltran was "armed and presently dangerous" to support a
frisk of his bag as part of a weapons pat-down. ECF No. 44 at 3. Defendant argues that
once the Defendant was placed into handcuffs and surrounded by officers, and once the
bag was separated from the Defendant by multiple yards, he had no means of accessing his
bag to harm deputies or others. ECF No. 29 at 9-10.

Defendant also argues that the officer's frisk of the bag cannot be supported by a
reasonable belief by officers that their safety was placed in danger by Ponce. *Id.* at 10.
Defendant contends that the facts of the encounter, in their totality, demonstrate that
deputies never considered Ponce to be a threat or danger to officer safety, and that when

3:24-cr-02616-JAH-1

Deputy Cook seized the backpack from Ponce, the deputy did nothing to frisk or detain Ponce, who remained uncuffed during the entire encounter. *Id*.

The Government argues in opposition that the weapons search of Defendant's bag was a justifiable *Terry* frisk because of reasonable concerns for officer safety while engaging in a *Terry* stop. ECF No. 35 at 12-13. The Government contends that, because deputies found pocketknives on the Defendant's person while Defendant was being frisked, they had reasonable suspicion to believe that Defendant's bag also contained weapons. *Id*. The Government further argues that it was reasonable for deputies to search the bag because Defendant could have escaped his handcuffs and reached the bag because the bag remained in "close proximity" to the Defendant. *Id*. at 14. In addition, the Government argues that the bag remained in the immediate vicinity of Ponce, and "Ponce, who was not handcuffed, had ready access to any weapons in the cross body bag." *Id.* Because the deputy who conducted the search purportedly had a reasonable belief that their safety or that of others was in danger by Defendant and Ponce's proximity to the bag, the Government contends there existed requisite justification for a frisk of the bag and the evidence subsequently discovered therein. *Id*. at 13-14.

**A. Legal Standard**

Officers engaging in a stop or an arrest of an individual may frisk both the individual and the belongings within the "immediate control" of the individual for weapons based on a reasonable suspicion that the individual and his or her access to those belongings constitute a reasonable risk to officer safety. *Michigan v. Long*, 463 U.S. 1032, 1049-1050 (1983). "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1050 (quoting *Terry*, 392 U.S. at 27).

A *Terry* search must be limited and must not exceed the boundaries set forth in precedent. *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993). The *Terry* search must be a "strictly circumscribed search for weapons," *Minnesota*, 508 U.S. at 378, based on an officer's reasonable belief that a suspect is "armed and dangerous." *Terry*, 392 U.S. at 27.

"The sole justification of the search," under *Terry*, is "the protection of the police officer and others nearby." *Minnesota*, 508 U.S. at 378 (citing to *Terry*, 392 U.S. at 29). The scope of the search "must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 18 (quotations and citation omitted) (collecting cases).

The allowance provided to officers to proceed with a search and seizure without probable cause or a warrant is carefully maintained by courts to remain "narrow" in scope. *Dunaway*, 442 U.S. at 210. The officers may not "enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will," that may lead to evidentiary searches that *Terry* "expressly refused to authorize" and that have been condemned by the Supreme Court. *Minnesota*, 508 U.S. at 378 (citation omitted). Indeed, the Ninth Circuit has found that, while reasonable suspicion may support a *Terry* stop of the suspect, officers may exceed the limits of *Terry* when they continue a detention of the suspect as part of a generalized investigation, and when they frisk the suspect without a reasonable basis to believe the suspect is armed and dangerous. *See Thomas*, 863 F.2d at 629-630. Officers must have "specific objective reasons why the suspect posed a risk to the safety of the officer." *Id.* at 629.

When an individual has been detained, handcuffed, and remains compliant with officer commands, a weapons search of the individual's bag located many yards away from the individual may exceed the scope of a weapons frisk under *Terry*. *United States v. Maddox*, 614 F.3d 1046, 1048-1049 (9th Cir. 2010) (finding that no reasonable threat to officer safety supported a search of a small container belonging to the defendant after the defendant was placed in handcuffs, remained compliant with officer instructions, and was removed from the vicinity of the container). *See also Baker*, 58 F.4th at 1117-1118. Courts must evaluate the factual circumstances in the totality to determine whether the detained defendant, and his or her potential access to the container, still posed a reasonable threat to officer safety. *Maddox*, 614 F.3d at 1049. Courts have found that, when a bag is not in the immediate control of the detained suspect, a subsequent search of the bag exceeds the limits

3:24-cr-02616-JAH-1

of a valid protective search under *Terry*. *United States v. Stanek*, 536 F. Supp. 3d 725, 740 (D. Haw. 2021) (finding no valid basis under *Terry* for a bag search when it was clear that the detained suspect could not reach the bag).

Other circuit courts have also held that a search of a suspect or arrestee's bag, while that individual is handcuffed and has no reasonable access to the bag, cannot be supported on the basis of exigency or threat to officer safety. *See United States v. Leo*, 792 F.3d 742, 749-752 (7th Cir. 2015) (holding that search of suspect's backpack while suspect was handcuffed, had no "immediate control" of the backpack, and presented no reasonable threat to officer safety exceeded the scope of a *Terry* search and requiring that the fruits of the search must be suppressed). *See also United States v. Buster*, 26 F.4th 627, 634 (4th Cir. 2022) (finding that, under the "limited search" authorized by *Terry*, no officer safety rationale was served when officers searched the suspect's bag once the suspect "was handcuffed on the ground and had no access to it.").

In addition, when a bag exists within the immediate control of an individual, courts evaluate whether the individual, and his or her access to the bag, constituted a reasonable risk to officer safety. *Michigan*, 463 U.S. at 1049-1050. A weapons frisk in the area within a person's "immediate control" is construed "to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 1048 (citation omitted). Courts evaluate a weapons search of a bag under *Terry* based on an officer's reasonable belief that an individual is "armed and dangerous." *Terry*, 392 U.S. at 27. In making this determination, courts look to whether the individual attempted to evade officer arrest, whether the individual demonstrated a risk to him or herself, or to the lives of officers, and whether a "reasonably prudent officer" would believe that the individual could access the bag and place the officer in danger. *United States v. Garcia*, 909 F.2d 389, 391-392 (9th Cir. 1990) (holding that "[d]ealing with a suspect who had shown a willingness to take great risks at high speeds on the highway, who had shown a distinct aversion to being stopped, and who was a big man on a dark road, reasonably prudent officers would have patted down both the man and the pack that could have contained a weapon.").

3:24-cr-02616-JAH-1

If the officer demonstrates a specific and objective safety rationale for frisking an individual and the accompanying bag for weapons, the frisk has legal support, and the weapon felt during the frisk of the bag may properly be entered into evidence. *Id.* at 392. If, however, the individual remains compliant with officers, no weapon is visible from the outside of the bag, and the individual does not engage in conduct that would place a reasonable officer in fear of his or her safety, "no exigency exists" for officers to frisk or otherwise search the individual's bag. *Maddox*, 614 F.3d at 1049. The bag, instead, remains protected from government intrusion by the Fourth Amendment. *See id.*

The Court will evaluate the Government's argument with respect to the contended danger to officer safety presented by Defendant and, in turn, by Ponce.

**B. Analysis**

The Government argues that the search of Defendant's bag was a valid *Terry* frisk for weapons or other dangerous objects that could harm officers. ECF No. 35 at 12-14.

**1. Threat to Officer Safety Posed By Defendant Beltran**

Officers engaging in a stop or an arrest of an individual may frisk both the individual and the belongings within the "immediate control" of the individual for weapons based on a reasonable suspicion that the individual, and his or her access to those belongings, constitutes a reasonable risk to officer safety. *Michigan*, 463 U.S. at 1049-1050. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1050 (citation omitted). A weapons frisk in the area within a person's "immediate control" is construed "to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 1048.

The Supreme Court and lower federal courts have placed meaningful considerations on proximity, the area in which a suspect has "immediate control," the characteristics and behavior of the suspect, and the circumstances surrounding his or her temporary detention in order to carefully maintain the "narrow scope" of a *Terry* weapons frisk. *Dunaway*, 442 U.S. at 210. The search of a bag within the immediate control of a detainee must be

3:24-cr-02616-JAH-1

supported by a reasonable belief that the detainee may gain access to the bag during the encounter and may harm officers as a result. *Garcia*, 909 F.2d U.S. at 391-392. It is a fact-intensive inquiry. *Id*. Otherwise, the bag must be treated as a personal belonging of the detainee to which the warrant requirement applies. *Maddox*, 614 F.3d at 1049.

Defendant argues that he was calm after being handcuffed, complied with commands from the beginning of the encounter, sat down while in handcuffs where the deputies directed him to, responded to the deputies' questions, and presented reasonable questions to the deputies. ECF No. 29 at 9. Defendant also argues as undisputed fact that his personal belonging was being held by Ponce at the time it was seized, who sat approximately 10 to 15 yards away from where Defendant sat while handcuffed and surrounded by officers. *Id*. at 10; Hr. Tr. 50:23-25; *Id.* at 61:24-25, 62:1-5. *See also* Court Order Ex. 1.

Here, there existed no reasonable basis for deputies to believe that Defendant could have accessed the bag, located 10 to 15 yards away by the account of the deputies, Hr. Tr. 50:25, while handcuffed and surrounded by deputies, and placed "[officer] safety or that of others…in danger" through his access to the bag. *Michigan*, 463 U.S. at 1050 (citation omitted). The bag was not within the Defendant's "immediate control" and could not be *Terry* frisked based on the purported danger to officer safety that Defendant allegedly posed. *Id.* at 1048-1049. In *Maddox*, the Ninth Circuit found that no reasonable officer safety rationale was served when an officer searched the personal belonging of a detainee after that detainee had been handcuffed, placed at a secure distance from the belonging, remained cooperative with officer commands, and presented no meaningful threat of accessing that belonging because of the nature of his detention. 614 F.3d at 1048-1049. In light of these circumstances, the detainee did not present "any threat to the arresting officer," and the officer did not have license to search his belongings for weapons that may implicate officer safety. *Id.*

The Government's argument that the frisk of Beltran's bag is justified under *Terry* by the danger Defendant posed because "Ponce and the cross-body bag remained in close proximity to the Defendant," ECF No. 35 at 14, is unreasonable and without merit, given

that the Defendant was handcuffed behind his back and seated, not in close proximity to the bag, but more than 10 yards away from the bag while being surrounded by multiple deputies.  The test under *Terry* that authorizes officers to conduct a limited search is not "mere possibility" of harm to officers, as the Government argues here, but that "the police officer's belief that his safety or that of others is in danger must be <u>objectively reasonable</u>— based on <u>reasonable inferences</u> from known facts—so that it can be tested at the appropriate time by 'the more detached, neutral scrutiny of a judge[.]'" *Dunaway*, 442 U.S. at 209 n.11 (quoting *Terry*, 392 U.S. at 21, 27) (emphasis added).  Just as in *Maddox*, here Beltran "cooperated" with the requests of the officers after his detention, remained seated while handcuffed and surrounded by officers, and had no access to a bag located 10 to 15 yards away. *See id.* at 1049.

Furthermore, when officers separate a person from his belongings, pat-down the person for weapons or threats to officer safety and later search the belongings when it is clear that the individual cannot access those belongings, as is the case here, no reasonable officer safety rationale is served.  *See Maddox*, 614 F.3d at 1048 n.2 (finding no threat to arresting officer from detainee's access to a key-chain container when the officer "took the keys, and placed them on the seat of Maddox's car; he did not open the key chain during a patdown search of Maddox, but after Maddox was secure in the patrol car and when the keys were no longer on his person.").  *See also Arizona v. Gant*, 556 U.S. 332, 343 (2009). *Accord Stanek*, 536 F. Supp. at 740 (finding that "Stanek could not have reached the bag when HPD officers searched it on the trunk of the car."), *and see United States v. Guzman-Guerrero*, 2016 WL 10951813, *4 (E.D. Wash. March 2, 2016) (holding that "the pertinent inquiry is, instead, the defendant's ability to gain control of the bag and any contents.").

As the court in *Buster* persuasively explained, "The government offers no explanation for how the contents of the bag <u>presented any credible threat to the officers' safety at the time they searched it</u>, and quickly frisking an unsecured suspect or a bag during a *Terry* stop is simply not the same as methodically searching the contents of a bag to which a suspect no longer has access—particularly where the suspect remained restrained and

under the officers' physical control." *Buster*, 26 F.4th at 634 (emphasis added). *And see in accord Leo*, 792 F.3d at 750-751 (holding that the search of the defendant's bag, after officers were unable to develop probable cause to continue the detention, was unreasonable and "*not* one that is authorized by *Terry* or any other precedent.") (emphasis in the original).

As to Defendant Beltran, the Court notes that Heimer testified that his concerns relating to officer safety was "Ms. Ponce and her possession of the bag, not Beltran's, but because it was on her person." Hr. Tr. 40:2-4. The Court finds that any threat initially posed by Beltran to the safety of the officers or others was neutralized by (1) his being handcuffed in less than two minutes of the valid *Terry* stop, (2) Beltran was handcuffed <u>behind his back</u>, (3) the lack of his proximity to the bag, (4) the absence of chaotic circumstances to distract the deputies from any actions by Beltran during their investigation, (5) the presence of multiple officers on site to secure and protect the scene, (6) the time of day, including daylight conditions and clear weather that permitted the deputies to monitor, control, and react to any potential sudden movements by Beltran towards the bag, and (7) the conduct, including actions and inaction, by experienced deputies that clearly demonstrated a lack of exigency and a lack of reasonable belief in deputy safety connected to the bag.[12] Ninth Circuit caselaw supports this conclusion. *See United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001) (finding that "[h]aving already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search," and holding that "[t]he search exceeded the 'strictly circumscribed' limits of *Terry*," requiring suppression of the ammunition found in the defendant's pocket). The Ninth Circuit's decision in *Miles* has been cited with approval by the Fourth Circuit. *See Buster*, 26 F.4th at 634.

---

[12] As noted, Deputy Heimer testified that he did not consider Beltran a threat to his safety. Hr. Tr. 40:2-4 (Heimer testifying that "[m]y concern at that point was Ms. Ponce and her possession of the bag, not Mr. Beltran's, but because it was on her person.").

Because, under the circumstances, a reasonably prudent officer would not believe that Beltran could access the bag and place deputies or others in danger, the deputies were required to obtain a warrant to search the personal belonging for its contents. *Maddox*, 614 F.3d at 1049.

**2. Threat to Officer Safety Posed by Ponce**

Beltran also argues that officers did not have a reasonable suspicion that Ponce was "armed and dangerous" to support removing the bag from her possession and frisking it under *Terry*'s officer safety rationale. ECF No. 29 at 9-10. Courts determine whether there was a founded suspicion for a pat-down search based on a totality of the circumstances. *United States v. Salas*, 879 F.2d 530, 535 (9th Cir. 1989).

Beltran contends that Ponce was never patted down, or *Terry* frisked at any time during the encounter, was never handcuffed, was instead interviewed by deputies as a victim in a domestic violence altercation, and made no aggressive movements at the moment Deputy Cook seized the bag from her. ECF No. 29 at 9-10. Defendant argues that the subsequent pat-down of the bag exceeded the scope of a protective weapons frisk under *Terry* and makes the search of the bag an unreasonable search and seizure under the Fourth Amendment. *Id.* at 10. The Government responds by arguing that "Ponce, who was not handcuffed, had ready access to any weapons in the cross body bag." ECF No. 35 at 14. The Government references four cases in support of its position, each detailed by the Court in turn below, that indicate how the officer safety rationale applies to the issue at hand. *Id.* at 12-13.

In *Garcia*, the Ninth Circuit upheld a search incident to an arrest of a bag located near a suspect when the suspect resisted arrest for a traffic violation. 909 F.2d at 390, 391. The court analyzed whether the frisk of the suspect and the bag found next to him was warranted by a reasonably prudent officer's belief that his safety was in danger. *Id.* at 391. The court held: "[d]ealing with a suspect who had shown a willingness to take great risks at high speeds on the highway, who had shown a distinct aversion to being stopped, and

who was a big man on a dark road, reasonably prudent officers would have patted down both the man and the pack that could have contained a weapon." *Id.*

In *Michigan*, the Supreme Court upheld a weapons pat-down of the areas in a car to which the defendant would generally have immediate control after the defendant was stopped pursuant to *Terry*. *Michigan*, 463 U.S. at 1050-1051. The Court found that the officers had a "reasonable belief that Long posed a danger if he were permitted to reenter his vehicle" because "[t]he hour was late and the area rural", "Long was driving his automobile at excessive speed, and his car swerved into a ditch," he "appeared to be 'under the influence' of some intoxicant," and officers could see in plain sight "a large knife in the interior of the car into which Long was about to reenter." *Id.* at 1050. The Court found that the officers possessed "an articulable and objectively reasonable belief that the suspect [was] potentially dangerous." *Id.* at 1051.

In *United States v. Medina*, the Ninth Circuit found in an unpublished opinion cited by the Government that a weapons frisk of a defendant's bag was justified when the defendant was validly stopped and frisked under *Terry* after a traffic stop. 130 F. App'x 862, 864 (9th Cir. 2005).[13] The court found that the defendant "could reach his backpack," located on top of a squad car near where defendant was being temporarily detained. *Id.* at 864. The fact that the defendant was not handcuffed and fled the scene while being surrounded by two officers before being handcuffed presented another factor in the court's assessment that the officers had a reasonable belief that the defendant may gain immediate control of a weapon and harm them. *Id.* In addition, the record in *Medina* indicates that officers developed reasonable suspicion that Medina, himself, was scouting cars and

---

[13] Unpublished decisions of the Ninth Circuit may generally not be cited to the courts of this circuit when such unpublished dispositions were issued before January 1, 2007. 9th Cir. R. 36-3(c) (citation of unpublished opinions). *See Hart v. Massanari*, 266 F.3d 1155, 1180 (9th Cir. 2001).

apartments in order to burglarize them, and the defendant conceded on appeal that officers had sufficient basis under *Terry* to stop and frisk him for weapons. *Id.* at 863.

And in *United States v. Mattarolo*, the Ninth Circuit upheld an officer's weapons frisk of a suspect that uncovered controlled substances when the suspect exited his car after an officer stopped his truck at night, approached the officer, and appeared likely to fight or flee. 209 F.3d 1153, 1158 (9th Cir. 2000).

Here, the difference between Ponce's conduct and those of the suspects in *Garcia*, *Michigan*, *Medina*, and *Mattarolo* is stark. Each suspect in the Government's cited cases was either lawfully arrested or lawfully detained at the time of the searches, which were conducted in close proximity to the officers pursuant to *Terry*. In each case, officers had at minimum reasonable suspicion that the suspects were involved in unlawful conduct <u>and</u> validly frisked them because of a reasonable belief that the suspects were armed and dangerous.

In the instant matter, all deputies involved in the encounter were aware at the beginning of the encounter that Ponce was assisting the deputies in calming down Beltran so that he may be detained without harming deputies or others, or engaging in a prolonged struggle with the handcuffing. Ponce stood immediately next to Heimer, Rost, and Green who were attempting to hold and handcuff Beltran. *See* BWC '680 at 18:23:35-24:30. Ponce reached for Beltran's shoulder and tapped him, as she encouraged Beltran not to struggle but instead to comply with the handcuffing, while three deputies were restraining him. *See id.* at 18:23:55-24:00. When Cook made initial contact during the handcuffing with Ponce, as the potential victim in the reported incident, he asked for her name and did not frisk her, despite clearly seeing the cross-body bag she wore across her shoulder. BWC '766 at 18:24:15-26. After making initial contact with Ponce, Cook could hear Ponce repeating her requests to Beltran to comply with the deputies who were handcuffing him. *Id.*

After Defendant declined to provide deputies with consent to search his bag post-handcuffing, Deputy Cook approached Ponce but did not proceed to immediately remove

3:24-cr-02616-JAH-1

the bag from her or demonstrate any exigency to remove the bag in order to neutralize the purported threat or danger posed by Ponce.  Instead, Cook waited until there was a break in the conversation between Ponce and Rost, and waited until he, Heimer and Ponce discussed who owned the bag, before directing Ponce to remove the bag she had been carrying behind her back.

In nearly all, if not all, cases identified herein that have approved the use of a *Terry* frisk, the officers acted with urgency to neutralize the perceived threat to their safety during a *Terry* stop posed by a suspect considered armed and presently dangerous, without engaging in niceties or seeking consent to search or frisk.  But here, the facts clearly reflect that deputies acted with no ounce of immediacy, and that no conduct or statements exist in the video evidence indicating a fear by any deputy for their safety with regard to Ponce.  Specifically, upon arriving at Ponce and Rost's location, Cook asked Ponce if the bag she was holding was the Defendant's.  She responded in the negative.  Deputy Cook told Ponce that he believed the bag belonged to the Defendant, and Ponce insisted that it belonged to her.  Deputy Heimer, overseeing Deputy Cook's conduct and questions to Ponce, wandered about in a circle after Ponce denied Cook's request to search the bag.  Deputy Cook then directed Ponce to place the bag on the table, which Ponce did, and Ponce held on to the bag's strap in reaction to Beltran yelling that Ponce was not on a Fourth Amendment waiver.[14]  Deputy Cook, after obtaining exclusive control of the bag, conducted an exterior pat down of the bag, then placed it back on the table within two to three feet of Ponce, abandoned it, and walked away to speak with Heimer in a muted discussion.

Cook testified that he knew the bag contained a Glock handgun as a result of his examination.  Yet there is no evidence that Cook alerted Rost, who stood immediately next

---

[14] As depicted on the BWCs, when Ponce held on to the strap of the bag for two to three seconds, Ponce was distracted by Beltran's statements that she was not on a Fourth Amendment waiver and that no consent existed for the search of the bag.  By the video evidence, no deputy engaged in conduct indicating any urgency to physically restrain Ponce when she briefly held on to the strap.

3:24-cr-02616-JAH-1

to Ponce, of his discovery and Ponce's ability to access the bag.  Instead, during the encounter, Ponce was allowed to look on, unrestrained, as Deputy Cook examined the bag's exterior after seizing it from her.  While Cook spoke to Heimer during the muted huddle, according to BWC '680 at 18:31:52-18:32:59, Ponce did not at any point look in the direction of the bag Cook had left beside her, let alone reach for it, until Heimer approached the bag after the huddle.  The above facts demonstrate that Cook, at no time, actually considered Ponce, or her access to the bag, to constitute a reasonable danger or threat to deputy safety.

As discussed above, courts approve a *Terry* frisk where officers immediately proceed to frisk suspects or their items with genuine urgency or a grounded basis to believe the suspect is dangerous to themselves or others.  *See e.g. Michigan*, 463 U.S. at 1050-1052 (finding that it was reasonable for deputies to believe that Long was dangerous, given that he was under the influence of an intoxicant and had driven his car into a ditch, and had a large knife nearby his person, late at night in a rural area), *and see Garcia*, 909 F.2d at 391-392 (finding that it was reasonable for officers to find Garcia dangerous because Garcia had evaded arrest at high speeds on a highway, appeared nervous and sweating, and was stopped at night on the side of a road).  The exigency, and the officer's contemporaneous statements and immediate conduct to frisk a person and his or her belongings, often bears independent indicia of credibility that officers operated from a genuine or reasonable belief that a person was armed or dangerous, and that officer safety was clearly or readily implicated.  The Fourth Amendment recognizes such conduct, and the officer's subsequent searches, as reasonable searches that enjoy status as an "exception" to the normal rules governing the Fourth Amendment's application.  In other words, officers who engage in a search out of an emergency or exigency during an encounter engage in conduct that is *per se* reasonable, and the evidence found through those searches

is not "poisoned," because it does not come about through violations of the Fourth Amendment.[15]

Under all the facts and circumstances of this case, including the credibility of the testimony provided by Heimer and Cook, there is no support for the deputies' assertion that Ponce was a danger and posed a threat to their safety. And, in contrast to the lawfully detained suspects in *Garcia*, *Michigan*, *Medina*, and *Mattarolo*, for which a bag frisk was permitted under *Terry*'s officer-safety rationale, Ponce more closely resembles the defendant in *Thomas*, where the Ninth Circuit found no justification existed for a frisk when an officer could not provide "more specific objective reasons why the suspect posed a risk to the safety of the officer." *Thomas*, 863 F.2d at 629. In *Thomas*, the Ninth Circuit held that the Government did not meet its burden in proving that the officer in the case had reason to believe that the suspect was "armed and dangerous" to justify the limited weapons pat-down. *Id.* at 628. Even though the court accepted the Government's position that the suspect was properly stopped under reasonable suspicion of criminal wrongdoing under *Terry* and appeared to be a "pretty big guy," the court found no support for a weapons pat-

_____

[15] The closest analogy may be in the field of evidence, where exceptional status is given to excited utterances: the spontaneity and excitement of those statements, and the conditions of stress and immediacy in which they were made, provide courts with significant assurances that the declarant of those statements was credible at the time those statements were made, and the statements bear a meaningful degree of reliability and trustworthiness. *See Idaho v. Wright*, 497 U.S. 805, 817, 820 (1990) (finding that "excited utterances" are firmly-rooted in history as an exception to the hearsay rules). Just as the spontaneity and stress involved in excited utterances provide courts with no issue as to their reliability for purposes of their admissibility, the spontaneity and stress involved in securing a suspect or the area of an encounter–and the limited searches that result therefrom–are generally considered reasonable and a natural part of the necessary "rubric of police conduct," for which the Fourth Amendment is not offended and for which the exclusionary rule does not apply. *Terry*, 392 U.S. at 20

3:24-cr-02616-JAH-1

down of the suspect or his belongings "without more <u>specific</u> <u>objective</u> reasons why the suspect posed a risk to the safety of the officer." *Id.* at 629 (emphasis added).[16]

The Ninth Circuit also found in *Thomas* that, while officers had the required legal basis under *Terry* to conduct a stop, the officers were required to have a reasonable basis to search the person and his or her belongings based on a reasonable determination that the suspect posed a danger to officer safety, and the Government had failed on this point to carry its burden of proof. 863 F.2d at 630. In *Thomas*, the court refused to accept the Government's position that "all investigatory stops would necessarily include a frisk," and indicated that if the Government succeeded with such an argument, "[w]ithout any reason whatsoever, a police officer could routinely ask about weapons and frisk the individual under suspicion." *Id.* The court in *Thomas* also reasoned that "[s]uch a result would not only destroy the necessary distinction between the stop and frisk, but would indiscriminately subject countless individuals to the humiliation and invasiveness" of weapons pat-downs, a result the court refused to accept. *Id.* Because "there [was] nothing to suggest that Thomas made any abrupt movements or engaged in suspicious, furtive behavior during the course of the investigation that would have justifiably prompted [the officer] to fear for his safety," the Ninth Circuit affirmed the district court's suppression of the illegal firearms Thomas had on his person. *Id.* at 629-630.

After obtaining biographical data from Ponce, including her lack of criminal history, and after being in her presence during the entirety of the encounter without exhibiting any fear or concerns regarding deputy safety as related to Ponce (*see generally* BWC '680), deputies "neither recognized [her] as a person with a criminal history nor had any particular reason to believe that [she] might be inclined to assault them." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). The facts of *Ybarra* closely mirror the facts of this case with respect to

---

[16] *Cf. Miles*, 247 F.3d at 1015 (finding that reasonable suspicion existed to detain the suspect, but that the weapons pat-down exceeded the "strictly circumscribed" limits of *Terry*).

Ponce.  *See* 444 U.S. at 92-93.  In *Ybarra*, the Government argued before the Supreme Court that Ybarra was "armed and presently dangerous," but the Court found that "Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening" to the police agents at the scene.  *Id.* at 92-93.  Each description provided by the Supreme Court with regards to Ybarra applies to Ponce in the instant matter.  There is also "nothing to suggest that [Ponce] made any abrupt movements or engaged in suspicious, furtive behavior during the course of the investigation that would have justifiably prompted [the officer] to fear for his safety."  *Thomas*, 863 F.2d at 629.  The factual record as to each of these factors and findings is clear.

The Court finds that the deputies did not have articulable, reasonable suspicion that Ponce was "armed and presently dangerous," *Ybarra*, 444 U.S. at 92-93, and posed a threat to officer safety, as required for deputies to search the bag.  To be clear, the Court reaches its conclusion based upon the foregoing including, but not limited to, the following:

(1)     Within seconds of the initiation of the handcuffing of Beltran, Ponce worked with deputies by encouraging Beltran to cooperate and permit the handcuffing, including by telling Beltran to calm down and patting his shoulder while the three deputies held and handcuffed him.  Deputies Heimer, Cook, Rost, and Green all observed Ponce assisting them in their efforts to handcuff Beltran;

(2)     Deputy Cook observed the cross-body bag on Ponce during his initial contact with her, but did not frisk Ponce or the bag when she was in close proximity of Beltran;

(3)     Ponce did not choose the table where she sat for the entirety of the encounter but was escorted to that table by Deputy Rost after deputies identified Beltran as the potential aggressor in the situation, based upon the information that justified the stop;

(4)     Ponce was in the presence of at least two deputies at nearly all times before Beltran's arrest;

(5)       Ponce herself was never frisked during the entire encounter;

(6)       For more than five minutes, beginning in the seconds after initiation of the handcuffing up until Deputy Cook searched the bag, deputies acted throughout the encounter in a manner contradictory to any reasonable belief that Ponce was "armed and dangerous," as BWC footage consistently demonstrates deputies casually interacting with Ponce, standing nearby her, evaluating her role as a potential victim in a domestic violence incident, and explaining the reasons for their handcuffing of Beltran, with Ponce being cooperative and responsive to their questions across the entirety of the encounter;

(7)       After Heimer realized that the bag was no longer on the table near Beltran, and that Ponce had it, Heimer did not proceed deliberately to Ponce in order to neutralize any potential threat posed by her access to the contents of the bag. Instead, Heimer took the moment to ask Beltran several questions, including for consent to search the bag, before walking with no sense of urgency to Ponce's location. And there was no evidence presented that Heimer provided warnings to alert other deputies on the scene of his asserted concerns regarding the danger posed by Ponce;

(8)       Heimer testified that he did not record in his official report feeling concerned about Ponce or her access to the bag at any point in the encounter. Hr. Tr. 40:21-25, 41:1-7;

(9)       Cook, after listening to Beltran's answers to Heimer's questions about the bag, walked from Beltran's location to Ponce's location with Heimer. Cook, like Heimer, did not demonstrate any urgency recognized in the cited caselaw as the inherent, responsive, and swift action authorized by the law to engage in a search to neutralize a threat of harm to officers;

(10)      Cook testified that he believed there could have been a weapon in the cross-body bag before frisking it because bags may generally conceal weapons. Hr. Tr. 53:18-21. Specifically, Cook testified that he believed that there was a weapon in the bag on Ponce's person because "[t]he chances of there being a weapon—would

have been inside the satchel [sic]" given that Beltran had previously been carrying the same bag;

(11)    Even after Cook learned that Ponce was never frisked, placed into handcuffs, or separated from the bag, Cook did not take swift action to neutralize any purported danger posed by Ponce.  No deputy took actions to restrain, detain, or protect themselves from Ponce while she sat nearby Cook as he engaged in the external search, or afterwards when Cook abandoned the bag on the table where Ponce was sitting;

(12)    No evidence was introduced that Cook warned Rost, who stood directly next to Ponce, that he identified a weapon purportedly felt during his external patdown that Ponce could readily access and use to subject Rost and other deputies to substantial risk of injury.

    a.    Even though Cook testified that he identified items certain to be a methamphetamine pipe and Glock weapon in the bag, he abandoned the bag on the table within lunging distance of Ponce;

    b.    The evidence, especially in BWC '680 at 18:31:30-18:32:55, reveals that the bag was left next to Ponce where it was unprotected for more than a minute. Not a single deputy's conduct was indicative of any reasonable belief by them that Ponce posed an imminent harm to their safety.

(13)    While Cook's extended frisk was taking place, Heimer justified the delayed detention to Beltran by stating that he was still waiting to evaluate whether Beltran was on a Fourth Amendment waiver, indicating that Heimer had no intention of terminating the *Terry* stop despite having concluded that the domestic violence investigation could not support the probable cause required for Beltran's arrest, Hr. Tr. 39:15-16; and

(14)    The record belies any reasonable suspicion asserted by Heimer and Cook that Ponce suddenly became a threat to their safety during the encounter.  Specifically, this Court finds that the evidence and reasonable inferences derived therefrom,

1   singularly or in combination, do not credibly support the testimonies of Deputies
2   Heimer and Cook that they had a reasonable basis to believe that Beltran and/or
3   Ponce were armed and dangerous and posed a threat to their physical safety in order
4   to authorize the search and manipulation of the bag.

5
6       The Court also finds that the search of the bag, in light of the totality of the
7   circumstances, took place after the beginning of a general criminal investigation of the
8   Defendant, or after the lawful *Terry* stop was effectively converted into a general search
    for evidence to support Defendant's arrest.

9       The search was outside the orbit of a permissible search for weapons designed to
10  mitigate an armed and dangerous circumstance that could place officers and others in
11  harm's way. *See Terry*, 392 U.S. at 27, 29, *and see Minnesota*, 508 U.S. at 378 ("The sole
12  justification" under *Terry* "is the protection of deputies and others nearby.").    Because
13  there existed no legal basis for the search of the bag, the circumstances here "amounted to
14  the sort of evidentiary search that *Terry* expressly refused to authorize…and that [the
15  Supreme Court has] condemned in subsequent cases." *Minnesota*, 508 U.S. at 378 (citing
16  to *Michigan*, 463 U.S. at 1049 n.14 and *Sibron*, *v. New York*, 392 U.S. 40 , 65-66 (1968)).

17      The Ninth Circuit, as well, has been cautious not to expand *Terry* past its breaking
18  point. *See Baker*, 58 F.4th at 1119 (finding the discovery of a handgun to be "the product
19  of illegal police conduct…exceeding the permissible scope of a *Terry* stop), *and see
20  Thomas*, 863 F.2d at 630 (holding that the authorization given to law enforcement for a
21  weapons search under *Terry* is "narrow" in scope and that, if the government succeeded on
22  its arguments, the result "would indiscriminately subject countless individuals to the
23  humiliation and invasiveness of a bodily frisk."). *See in accord Leo*, 792 F.3d at 751-752
24  (holding that officers may not conduct a general search of a suspect's bag when they are
25  unable to develop probable cause for an arrest after a *Terry* stop, and suppressing the
26  firearm found in the suspect's bag).
27
28

3:24-cr-02616-JAH-1

1    As a result, the contents discovered after the search of the bag must be suppressed
2    as fruits of a Fourth Amendment violation.  *Wong Sun*, 371 U.S. at 488.

3    **3.  External Manipulation and Plain Feel of the Bag**

4    Because the Court determines the contents found within the bag were obtained as a
5    result of an illegal frisk outside the bounds of *Terry*, and are therefore suppressed, the Court
6    need not address the parties' arguments regarding whether Deputy Cook's manipulation of
7    the bag exceeded the scope of a valid pat-down under *Terry* and the extent, if any, of the
8    plain feel doctrine's application.

9    **III.   Whether Defendant Was "In Custody" While Making Statements.**

10   For the reasons stated in Section I above, Defendant was not under a *de facto* arrest
11   during the initial phase of his detention by Deputy Heimer and other deputies on the scene.
12   The statements made prior to Deputy Heimer's questions relating to Defendant's gang
13   affiliation and whether he had a Fourth waiver, are admissible statements as they were
14   made pursuant to a lawful *Terry* stop.   In contrast, the statements made by Beltran in
15   response to questions after Deputy Heimer initiated a general investigation of the
16   Defendant were statements made during an unlawful detention that exceeded the scope of
17   *Terry*.  *See Baker*, 58 F.4th at 1117-1118 (finding a Fourth Amendment violation when
18   officers exceeded the scope of a limited *Terry* stop and suppressing the fruits of the
19   violation).  As a result, the statements made by the Defendant after Deputy Heimer initiated
20   a general criminal investigation are suppressed.

21   ///
22
23
24
25
26
27
28

3:24-cr-02616-JAH-1

1

**CONCLUSION**

2      Courts must be careful that expansions upon the recognized exceptions of the Fourth

3  Amendment do not erode the very interests the amendment was designed to protect.  The

4  exception allowing officers to search and seize a person and his or her belongings in order

5  to neutralize threats to officer safety during a *Terry* stop must be evaluated with due

6  consideration to the proximity a suspect has to a weapon, both temporally and physically,

7  whether the suspect is dangerous, and the nature of the encounter as evaluated under the

8  totality of the circumstances.  The Supreme Court's decision in *Terry* itself expresses

9  meaningful limits on the spatial proximity a suspect must have to a potential weapon while

10 officers engage in an investigation "at close range," and officers must reasonably believe

11 the suspect is "armed and presently dangerous" in order to initiate a frisk.  392 U.S. at 24.

12      As the Supreme Court has established in cases where officers fail to acquire a

13 warrant for their search: "[n]o reason, except inconvenience of the officers and delay in

14 preparing papers and getting before a magistrate, appears for the failure to seek a search

15 warrant.  But those reasons are no justification for by-passing the constitutional

16 requirement."  *McDonald v. United States*, 335 U.S. 451, 455 (1948).  Additionally, as the

17 Supreme Court has found:

18      "We are not dealing with formalities. The presence of a search warrant serves a high
19      function. Absent some grave emergency, the Fourth Amendment has interposed a
20      magistrate between the citizen and the police. This was done not to shield criminals
        nor to make the home a safe haven for illegal activities. It was done so that an
21      objective mind might weigh the need to invade that privacy in order to enforce the
22      law. The right of privacy was deemed too precious to entrust to the discretion of
        those whose job is the detection of crime and the arrest of criminals… And so the
23      Constitution requires a magistrate to pass on the desires of the police before they
24      violate the privacy of the home. We cannot be true to that constitutional requirement
        and excuse the absence of a search warrant without a showing by those who seek
25      exemption from the constitutional mandate that the exigencies of the situation made
26      that course imperative."  *McDonald*, 335 U.S. at 455-456.

27

28

The constitutional right to privacy extends to a person's papers and effects, and it protects the person's bags, purses, and luggage. *Maddox*, 614 F.3d at 1049. Here, the Government has not carried its burden to demonstrate the danger and exigencies of the encounter that made the dispensing of the search warrant and a neutral magistrate an imperative. Defendant's motion to suppress the bag and its contents, and a portion of his statements, is GRANTED.

Accordingly:

1. The lawful *Terry* stop was converted to a *de facto* arrest;

2. The contents found after the search of Defendant's bag are suppressed; and

3. Defendant's statements, made to deputies after Deputy Heimer concluded his investigation into the domestic violence incident at BWC '904 18:27:56 and onwards, are suppressed.

**IT IS SO ORDERED.**

DATED: September 9, 2025

JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE

3:24-cr-02616-JAH-1

# COURT ORDER

# EXHIBIT 1

